TYRONE MCEADY, et al.,

              Plaintiffs,

    v.

CAMDEN COUNTY POLICE
DEPARTMENT,

              Defendant.

1:16-cv-1108-NLH-JS

**OPINION**

**APPEARANCES:**

JAMES A. BELL IV
CHRISTOPHER ALAN MACEY, JR.
BELL & BELL, LLP
1617 JOHN F. KENNEDY BOULEVARD
SUITE 1020
PHILADELPHIA, PENNSYLVANIA 19103

    *On behalf of Plaintiffs*

CHRISTINE P. O'HEARN
KELLY E. ADLER
BENJAMIN S. TERIS
BROWN & CONNERY, LLP
360 HADDON AVENUE
WESTMONT, NEW JERSEY 08108

    *On behalf of Defendant*

**<u>HILLMAN</u>, District Judge**

    Plaintiffs Tyrone McEady ("McEady"), Robert Babnew
("Babnew"), and Steven L. Fritz ("Fritz," and collectively,
"Plaintiffs") filed suit against the Camden County Police

Department ("Defendant"), alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("the ADEA"), race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) et seq. ("Title VII"), and retaliation for Plaintiffs' opposition to discrimination under both the ADEA and Title VII. (See generally Am. Compl. [Docket Item 21].)

Defendant subsequently moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Mot. for Summ. J. [Docket Item 58].) Plaintiffs filed a Response in Opposition to the Motion for Summary Judgment. (Response in Opposition [Docket Item 60].) Defendant filed a timely Reply. (Reply Brief [Docket Item 64].) For the reasons expressed below, Defendant's Motion will be granted in full.

## BACKGROUND

### A.   Formation of the Camden County Police Department

On August 25, 2011, the City of Camden, the County of Camden, and the State of New Jersey entered into a Memorandum of Understanding to provide for the creation of a Camden County Police Department, which would offer services to municipalities within Camden County. (See Memorandum of Understanding [Docket Item 58-7].) On January 26, 2012, the Camden County Board of Chosen Freeholders approved the establishment of the County Police Department to function through shared services or

participation agreements with municipalities in the County.
(See Freeholders' Resolution [Docket Item 58-8].)

In December 2012, the New Jersey Civil Service Commission approved the City of Camden's plan to lay off all uniformed Camden City Police Officers by April 30, 2013. (See Civil Service Commission Letter [Docket Item 58-9].) The City Council passed a resolution on January 4, 2013, also approving the City's layoff plan. (See City Council Resolution [Docket Item 58-10].) On April 30, 2013, all Camden City Police Officers were officially laid off and the Camden City Police Department was dissolved. Carmichael v. Thomson, No. 14-3323, 2018 WL 4629516, at *7 (D.N.J. Sept. 27, 2018). Defendant Camden County Police Department assumed all police functions in the City of Camden the following day, on May 1, 2013. (See Police Services Agreement [Docket Item 58-11].)

To prepare for the transition, the New Jersey Civil Service Commission established a Pilot Program to facilitate "expeditious appointment of qualified law enforcement officers to staff the [Department]." (October 3, 2012 Civil Service Commission Order [Docket Item 58-12], at 1.) Under the Pilot Program, all Civil Service rules concerning hiring and promotion were suspended between November 1, 2012, and October 31, 2013. (Id. at 9-17.) The Program was designed "to employ up to 420 new police officers and a sufficient number of related civilian

3

personnel," and was "an extreme measure to immediately address the staffing needs of the new [Department]." (Id. at 2.) Moreover, while the Pilot Program was designed to recruit from multiple applicant pools, including civilians and current law enforcement, the Commission noted that "[t]here will be no specific number of [police officers] drawn from any single source." (Id.)

In the months before the County Police Department began operating, the City police officers' union, the Fraternal Order of Police, Lodge #1 ("the FOP"), negotiated with the County to agree on a hiring and transition plan. (See January 15, 2013 Cappelli Letter [Docket Item 58-13].) On January 15, 2013, Camden County Freeholder Director Louis Cappelli sent a letter to all members of the FOP, notifying them of the County Department's implementation status and the ongoing negotiations. (See id.) The County originally offered to guarantee consideration for all union members; the offer would remain on the table until January 31, 2013, and after that date, if no deal was reached, the County would proceed with the hiring of no more than 49% of Camden City Police Officers. (Def. Answers to Interrog. [Docket Item 58-17], ¶ 4.)

Cappelli sent an additional update on January 29, 2013, advising that the County would not extend the deadline for the proposed agreement with the FOP past January 31st, and

emphasizing the proposed retirement incentives available for City officers who submitted applications prior to January 31, 2013. (See January 29, 2013 Cappelli Letter [Docket Item 58-14].) The FOP and the County subsequently failed to reach an agreement to hire union members after the union rejected the deal. (Babnew Dep. [Docket Item 60-8], 46:13-17.)

**B.    Pilot Program**

Defendant then established its hiring process pursuant to the Civil Service Commission's Pilot Program provisions. (Cirii Dep. [Docket Item 60-7], at 7:10-14.) Under the Pilot Program, Defendant planned to hire from three applicant pools: Camden City Police Officers, law enforcement officers from other jurisdictions who were Police Training Commission ("PTC") certified, and civilian applicants. (Della Vecchia Dep. [Docket Item 60-6], at 60:1-9; Def.'s Answer to Interrog. [Docket Item 58-17], ¶ 4.) Defendant's goal was to create a "diverse department that was reflective of the city." (Della Vecchia Dep. [Docket Item 60-6], at 62:19-63:6.)

Because of their familiarity with the community and the fact that they could be deployed "right out on the street" upon hire, Camden City officers were considered "a completely different pool than any other applicant." (Id. at 48:9-14, 57:23-58:4.) Camden City Police Officers were therefore afforded a "more streamlined process" than other applicants for

positions with Defendant and were given "first priority" in
hiring.  (Id. at 38:14-16; Def.'s Answer to Interrog. [Docket
Item 58-17], ¶ 4.)  To that end, unlike other applicants, City
officers were not required to undergo a psychological assessment
or physical exam.  (Della Vecchia Dep. [Docket Item 60-6], at
48:19-24.)

Instead, City officers were required to first submit a
written application, which Ed Fanelle, Camden County Public
Safety Director, would log.  (Della Vecchia Dep. [Docket Item
60-6], at 50:11-14; see also Application Log [Docket Item 58-
22].)  Internal Affairs would then review the application and
confirm that there were no pending disciplinary actions or
disqualifying investigations on the applicant's record.  (Lynch
Dep. [Docket Item 58-21], at 15:14-20.)  If Internal Affairs
approved the application for next steps, Michael Lynch
("Lynch"), Deputy Police Chief, would review the applications
and then recommend applicants to move forward to an interview
panel.  (Della Vecchia Dep. [Docket Item 60-6], at 36:1-3;
50:11-13.)  If the interview panel approved of an applicant, the
final hiring decision would then go to the Camden County Board
of Chosen Freeholders.  (Id. at 51:1-3.)  This process was
otherwise the same for all applicants under the Pilot Program,
regardless of their prior employment or law enforcement
experience.  (Id. at 48:25-49:6.)

As an incentive for City police officers to apply for employment with Defendant Camden County Police Department as soon as possible, those who applied prior to January 31, 2013, would be able to carry over their time of service, fringe benefits, and pension credit from the City to the County. (Lynch Dep. [Docket Item 58-21], at 18:13-23.) An April 1, 2013 deadline was "imposed on all New Jersey Law Enforcement Officers who wished to apply and have up to seven years of service considered by the County if hired." (County Counsel Letter [Docket Item 58-33], at 2.) The January 31, 2013 date "was solely to provide an additional benefit to Camden City Police Officers; it in no way impacted the ability for any officer to submit an application." (Id.)

**C.  Plaintiffs' Backgrounds**

Plaintiff McEady was employed by the Camden City Police Department from approximately 1994 through April 2013. (McEady's Answer to Interrog. [Docket Item 58-4], ¶ 2.) McEady, an African American male, was 49 years old at the time he applied for employment as a police officer with Defendant. (Id. ¶ 1; Am. Compl. [Docket Item 21], ¶ 17.)

Plaintiff Babnew was employed with the Camden City Police Department from approximately 1994 through April 2013. (Babnew's Answer to Interrog. [Docket Item 58-5], ¶ 2.) Babnew, a Caucasian male, was 42 years old at the time he applied for

employment with Defendant.  (Id. ¶ 1; Lynch Dep. [Docket Item 58-21], at 40:7-8.)

Plaintiff Fritz was employed with the Camden City Police Department from approximately January 27, 2003, through April 2013.  (Pl. Fritz's Answer to Interrog. [Docket Item 58-6], ¶ 2.)  Fritz, a Caucasian male, was 45 years old at the time he applied for employment with Defendant.  (Id. ¶ 1; Lynch Dep. [Docket Item 58-21], at 40:9.)

Plaintiffs were all members of the FOP, which "generally opposed the formation of the Camden County Police Department." (Fritz Dep. [Docket Item 60-5], at 30:5-7.)  During the months preceding the formation of the Camden County Police Department, Plaintiffs attended union meetings where the members discussed the transition from City to County and the upcoming disbandment of the Camden City Police Department.  (McEady Dep. [Docket Item 60-11], at 23:17-24:22.)  Attendees at the union meetings also discussed "getting laid off, getting a job [with Defendant], who was going to be hired, what's the salary."  (Babnew Dep. [Docket Item 60-8], at 36:10-14.)

Plaintiff McEady stated that he "attended most of the union meetings where the formation of the [Camden County Police Department] was discussed," but could not remember if he spoke at any of those meetings.  (McEady Dep. [Docket Item 60-11], at 25:20-26:1.)  Plaintiff Babnew was "outspoken at the union

meetings" during the months preceding the formation of the
County department.  (Babnew Dep. [Docket Item 60-8], at 115:2-
116:1.)  Plaintiff Fritz also attended union meetings, but did
not speak there.  (Fritz Dep. [Docket Item 60-5], at 27:21-
29:22.)

In April 2012, some 18 months before his application to the
new department was rejected, Plaintiff Babnew sent an email to
John Williamson, president of the FOP, complaining about the
treatment of older officers by Camden County Police Chief Scott
Thomson ("Chief Thomson") and others within the Camden County
Police Department.  (Babnew Dep. [Docket Item 60-8], at 109:14-
16, 113:3-5.)  Plaintiff Babnew asked Williamson to submit the
complaint to the County business administrator, and "would
imagine [Chief Thomson] is aware of it."  (Id. at 112:8-11.)
However, Plaintiff Babnew "[did not] have personal knowledge" of
whether "the chief [knew] that it was [Plaintiff Babnew] that
made this E-mail."  (Id. at 112:12-23.)   Plaintiff Babnew also
discussed his concerns about discrimination at the union
meetings, but did not know whether the Chief or other County
personnel were aware of his comments.  (Id. at 115:5-16.)

Plaintiff Babnew also testified that he believed Chief
Thomson had a "discriminatory animus" against older police
officers based on an October 2013 interview given to the

<u>Trentonian</u> newspaper.[1]  Plaintiff Babnew recalls Chief Thomson telling the newspaper: "out with the old, in with the new culture," and allegedly called the Camden City Police Department "old and tired."  (Babnew Dep. [Docket Item 60-8], at 81:22-82:13.)

### D.  Defendant's Hiring Decisions

Plaintiff Babnew submitted his application to Defendant Camden County Police Department on March 18, 2013.  (Babnew Dep. [Docket Item 60-8], at 53:20-23.)  Plaintiff McEady submitted his application on March 19, 2013.  (McEady's Answer to Interrog. [Docket Item 58-4], ¶ 9.)  Plaintiff Fritz submitted his application on March 29, 2013.  (Fritz Dep. [Docket Item 60-5], at 46:14-16.)

Based on discussions with supervisors and from the County Freeholders, Plaintiff McEady understood that "[w]e had until April 1st to sign up if we didn't sign up January 31st." (McEady Dep. [Docket Item 60-11], at 31:16-32:2.)  While he did not believe that there was a "guarantee" to be hired, (Pl. Fritz Dep. [Docket Item 60-5], at 33:18-20), Plaintiff Fritz also believed that he could still apply by April 1st based on a memo,

---

[1] A copy of this interview or article has not been provided to the Court.  Defendant does not contest the accuracy of Babnew's description of Chief Thomson's statements to the media.  The Court views the evidence in the light most favorable to the nonmoving parties, here Plaintiffs.

which according to him, was "most likely [from] Lou Cappelli."
(Id. at 33:11-17.)

Plaintiff Babnew, meanwhile, believed that consideration
for employment would be guaranteed if he submitted his
application before April 1, 2013, based on conversations he had
with Ed Fanelle, then Civilian Police Director for the Camden
County Police Department.  (Pl. Babnew Dep. [Docket Item 60-8],
at 56:13-18.)  On March 18, 2013, the day Plaintiff Babnew
submitted his application for employment as a police officer, he
spoke with Defendant's employee Lieutenant Joe Saponare, who
assured him that he would be hired if he submitted his
application that day.  (Id. at 53:5-54:20.)  After submitting
his application, and prior to his rejection in November,
Plaintiff Babnew spoke on the phone with Lieutenant Saponare,
who informed him that his application was being processed and
that he would be hired.  (Id. at 76:3-22.)

As it turns out, Plaintiffs were misinformed.  On or around
March 14, 2013, Ed Fanelle directed Frank Cirii, Camden County
Director of Human Resources, to send conditional offers of
employment to the selected Camden City Police Officers who had
already applied.  (Cirii Dep. [Docket Item 60-7], at 21:13-22;
see generally Offer Letters [Docket Item 58-23].)  However,
Cirii could not recall any time at which he was instructed not

to accept any more applications from former City officers. (Id. at 24:23-25:1.)

Marge Della Vecchia, Deputy County Administrator, stated that once this first set of conditional offer letters was sent, "I know that we moved forward in looking at the other applicants who had made application to the county police department." (Della Vecchia Dep. [Docket Item 60-6], at 17:5-8.) By this time, Defendant "had already mailed all of the letters with conditional offers of employment to the former City of Camden police officers who were instructed to report on March 18, 2013." (County Counsel Letter [Docket Item 58-33], at 3.) At this point, Defendant "turned its attention to hiring new officers for its first academy class." (Id.) However, like Mr. Cirii, Della Vecchia was not aware of a time that Camden County Police Department stopped accepting employment applications from former Camden City Police Officers. (Della Vecchia Dep. [Docket Item 60-6], at 17:24-18:3.)

Defendant ultimately hired 151 former Camden City Police Officers, all of whom applied prior to March 14, 2013. (Chart of City Officers Hired [Docket Item 58-24]; Pl.'s RSMF [Docket Item 60-4], ¶ 63.) Of these accepted applicants, four applied after January 31, 2013, but before March 14, 2013, and all four were over 40 years old at the time they applied. (Def.'s SMF [Docket Item 58-2], ¶¶ 72-73.)

Defendant Camden County Police Department did not hire any
of the 23 Camden City Police Officers who applied after March
14, 2013, including the three Plaintiffs. (Della Vecchia Dep.
[Docket Item 60-6], at 48:2-8.) Of those 23 officers, 16 were
40 years of age or older and 7 were under the age of 40, while
12 were African American and 11 were Caucasian or another race.
(Def.'s SMF [Docket Item 58-2], ¶¶ 85-86.) Other PTC certified
applicants who applied after March 14, 2013, were hired, but
none were previously employed by Camden City Police Department.
(Della Vecchia Dep. [Docket Item 60-6], at 23-28.)

In addition to the 151 former Camden City officers hired on
or before March 14, 2013, Defendant hired 312 new officers from
other law enforcement and civilian applications.[2] (See Chart of
Officers Hired During Pilot Program [Docket Item 60-26].) Of
those 312 new hires, 21 new officers were 40 years of age or
older and 32 were African American. (Pl. Supp. SMF [Docket Item
60-3], ¶¶ 73-74.) Of the 152 Camden City officers hired, 111
were 40 or older and 32 were African American. (See Chart of

---

[2] The parties dispute the relevance of the racial and age makeup
of the non-Camden City officer applicants. The parties have
only provided demographic information for hired officers, not
for the wider applicant population. Judge Williams granted
Plaintiffs leave to file a motion to compel this additional
data. (Scheduling Order [Docket Item 32].) Plaintiffs have not
done so.

Officers Hired During Pilot Program [Docket Item 60-26].)  On

November 25, 2013, Frank Cirii sent rejection letters to

Plaintiffs and others.  (See Rejection Letters [Docket Item 58-

30].)

## PROCEDURAL HISTORY

On February 26, 2016, Plaintiffs filed their Complaint in

the present action.  (Compl. [Docket Item 1].)  On June 6, 2016,

Defendant moved to dismiss the Complaint pursuant to Fed. R.

Civ. P. 12(b)(6) for failure to state a claim.  (Mot. to Dismiss

[Docket Item 7].)  Plaintiffs filed a Response in Opposition,

(Response [Docket Item 9]), and Defendant timely filed a Reply,

(Reply [Docket Item 12]).  The Court granted Defendant's Motion

in part and denied it without prejudice in part.  McEady v.

Camden Cty. Police Dep't, No. 16-1108, 2017 WL 253156 (D.N.J.

Jan. 20, 2017) (Simandle, J.).

On March 8, 2017, Plaintiffs filed an Amended Complaint to

cure the original Complaint's deficiencies.  (Am. Compl. [Docket

Item 21].)  Count I of the Amended Complaint alleges that

Defendant violated the ADEA with respect to its decision to not

hire all three Plaintiffs.  (Id.)  Count I alleges those

violations to have occurred via disparate impact, disparate

treatment, and retaliation.  (Id.)  Count II alleges that

Defendant violated Title VII with respect to its decision not to

hire Plaintiff McEady, also by way of disparate impact,

14

disparate treatment, and retaliation. (Id.) Defendant filed an Answer to the Amended Complaint on March 22, 2017. (Answer [Docket Item 22].)

Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Mot. for Summ. J. [Docket Item 58].) Plaintiffs filed a Response in Opposition, (Response [Docket Item 60]), and Defendant timely filed a reply brief, (Reply Br. [Docket Item 64]). For the reasons expressed below, Defendant's motion will be granted in full.

## STANDARD OF REVIEW

Summary judgment will be granted if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and the party seeking summary judgment is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citing FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility

15

determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence 'is to be believed and
all justifiable inferences are to be drawn in his favor.'"
Marion v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).

The moving party first bears the burden of demonstrating
the absence of a genuine issue of material fact.  Celotex, 477
U.S. at 323 ("[A] party seeking summary judgment always bears
the initial responsibility of informing the district court of
the basis for its motion, and identifying those portions of 'the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of
material fact.").  The moving party may discharge that burden by
"'pointing out to the district court[ ]that there is an absence
of evidence to support the nonmoving party's case' when the
nonmoving party bears the ultimate burden of proof."  Singletary
v. Pa. Dep't of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)
(quoting Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving
party must identify specific facts showing that a genuine issue
for trial exists.  Celotex, 477 U.S. at 324.  The party "may not
rest upon the mere allegations or denials of the . . .
pleading[s]," but instead must rely on affidavits or other
documents.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.

2001).  To withstand summary judgment, the nonmoving party "must

'make a showing sufficient to establish the existence of [every]

element essential to that party's case, and on which that party

will bear the burden of proof at trial.'"  Cooper v. Sniezek,

418 F. App'x 56, 58 (3d Cir. 2011) (quoting Celotex, 477 U.S. at

322).  Therefore, to prevail in opposition of a motion for

summary judgment, the nonmoving party must identify specific

facts and affirmative pieces of evidence that contradict those

offered by the moving party.  Anderson, 477 U.S. at 257.

## DISCUSSION

Plaintiffs raise three types of claims, all under both the

ADEA and Title VII: (1) disparate treatment, (2) disparate

impact, and (3) retaliation.  Defendant argues that none of

those claims can survive summary judgment.  Defendant first

argues that Plaintiffs' disparate treatment claims fail because

Plaintiffs cannot state a prima facie case under the ADEA or

Title VII or, in the alternative, cannot establish pretext.

Second, Defendant argues that Plaintiffs' disparate impact

claims fail because Plaintiffs cannot state a prima facie case

under either statute.  Finally, Defendant argues that

Plaintiffs' retaliation claims fail because Plaintiffs cannot

state a prima facie case under either statute.  The Court will

address claim each in turn.

**A. Disparate Treatment Claims**

The Court will first consider Plaintiffs' allegations of
discriminatory failure to hire in violation of the ADEA and
Title VII.

### 1. Direct Evidence

Plaintiffs appear to rely on both direct and circumstantial
evidence of discrimination in proving their ADEA claim.   The
direct evidence comes in the form of the comments that Chief
Thomson allegedly made in an interview given to the Trentonian
newspaper.   In order for the comments to serve as direct
evidence of discrimination, the Court must consider how and if
they are related to the adverse employment decision.   See
Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269 (3d Cir.
2010); Parker v. Verizon Pa., Inc., 309 F. App'x 551, 558-59 (3d
Cir. 2009).   Direct evidence of discrimination must permit a
factfinder "to infer that a discriminatory attitude was more
likely than not a motivating factor in the [defendant's]
decision.'" Anderson, 621 F.3d at 269 (citations omitted).
"Stray remarks by non-decisionmakers or by decisionmakers
unrelated to the decision process are rarely given great weight,
particularly if they were made temporally remote from the date
of decision."   Parker, 309 F. App'x at 559 (quoting Ryder v.
Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997)).
When considering stray remarks, the Court takes the following
factors into account: "(1) the relationship of the speaker to

18

the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." Id. at 559.

As to the first factor, the comments in question were allegedly made by Chief Thomson, whose relationship to Plaintiffs is obviously one of distinct superiority. However, Plaintiffs have offered no evidence whatsoever that Chief Thomson was a decisionmaker throughout the CCPD's hiring process. Plaintiffs offer no evidence to suggest that Chief Thomson designed the program, was involved in interviews of applicants, reviewed applications, or was in any other substantial way involved in the hiring process. Therefore, despite Chief Thomson's position in the CCPD, the first factor weighs against finding that his alleged stray remarks constitute direct evidence of discrimination sufficient for a factfinder to infer that a discriminatory motive was behind Defendant's decision not to hire these Plaintiffs.

As to the second factor, Plaintiffs claim that the alleged interview took place in October 2013. Defendant sent Plaintiffs their rejection letters on November 25, 2013. At first, it would appear that Chief Thomson's alleged comments were temporally proximate to the adverse employment decision. However, Plaintiffs vigorously argue in their briefs that their

Defendant "ignored and discarded" Plaintiffs' applications almost immediately upon receiving them. (Response [Docket Item 60], at 6.) Taking Plaintiffs at their word, it would appear that Defendant made its decision not to hire Plaintiffs sometime in March 2013 — more than six months before Chief Thomson made his alleged comments to the newspaper. This, too, cuts in favor of finding that Plaintiffs' purported direct evidence is insufficient to permit a factfinder to infer that Defendant had a discriminatory motive in its decision not to hire Plaintiffs.

The final factor revolves around the purpose and content of the alleged statement. Lacking access to the alleged interview makes this factor particularly difficult for the Court. However, there is some context around the small sample that Plaintiffs have provided. Considering Chief Thomson's position and lack of involvement in the hiring process, as well as the fact that Defendant hired 152 former Camden City Police Officers (of whom 111 were at least 40 years old), the Court finds that no reasonable jury could consider Chief Thomson's comments to be indicative of a discriminatory motive by Defendant.

In sum, these were stray comments made by a non-decisionmaker well after Plaintiffs' applications had been effectively rejected. They were made in a context that lends no credibility to an assertion that the comments illustrated Defendant's discriminatory animus toward Plaintiffs. Plaintiff

proffers no other evidence of discriminatory animus.  Therefore, the Court finds that these vague, isolated, stray comments which in no way reference the Plaintiffs directly fail to demonstrate that an invidious discriminatory reason was more likely than not a motivating cause of Defendant's decision not to hire Plaintiffs.

## 2. McDonnell Douglas Evidentiary Framework

Plaintiffs also contend that they have indirect or circumstantial evidence that Defendant discriminated against them on the basis of age and, in McEady's case, race. Therefore, the McDonnell Douglas burden-shifting framework applies to each of Plaintiffs' claims under the ADEA and Title VII.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (applying the McDonnell Douglas framework to an ADEA case).

Under this framework, the Plaintiffs have the initial burden of establishing a prima facie case of discrimination under the relevant statute.  McDonnell Douglas, 411 U.S. at 802; see also Parikh v. UPS, 491 F. App'x 303, 307 (3d Cir. 2012) ("[P]laintiff must establish a prima facie case of discrimination.").  This requires the plaintiff to produce sufficient evidence to allow the factfinder to infer the fact at

issue.  <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 254 n.7 (1981).

There are four elements to a prima facie case for failure to hire under the ADEA and Title VII.  The first three elements are identical under both statutes: a plaintiff must show that they (1) are a member of a protected class;[3] (2) applied for a job for which they were qualified; and (3) were not hired for the job in question.  <u>See</u> <u>Fowle v. C & C Cola</u>, 868 F.2d 59, 61 (3d Cir. 1989) (ADEA); <u>Fuentes</u>, 32 F.3d at 763 (Title VII).  The fourth element that the plaintiff must prove under the ADEA is "that the employer either ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination, or continued to seek applicants from among those having plaintiff's qualifications."  <u>Fowle</u>, 868 F.2d at 61 (citations omitted).  The fourth element that the plaintiff must prove under Title VII is that, "under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to [the plaintiff's] to fill the position."  <u>Dougboh v. Cisco Sys.</u>, 726 F. App'x 914, 916 (3d Cir. 2018).

---

[3] Under the ADEA, an individual who is at least 40 years old is a member of a protected class.  29 U.S.C. § 631(a) (2018).  Title VII's protected classes are race, color, religion, sex, and national origin.  42 U.S.C. § 2000e-2(a)(1) (2018).

Once a plaintiff has established a prima facie case, the
burden shifts to the defendant, who must provide a legitimate,
non-discriminatory reason for the adverse employment action.
McDonnell Douglas, 411 U.S. at 802-03; Burdine, 450 U.S. at 253;
St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07.  Under the
law,

> [t]he employer satisfies its burden of production by
> introducing evidence which, taken as true, would
> permit the conclusion that there was a
> nondiscriminatory reason for the unfavorable
> employment decision.  The employer need not prove that
> the tendered reason _actually_ motivated its behavior,
> as throughout this burden-shifting paradigm the
> ultimate burden of proving intentional discrimination
> always rests with the plaintiff.

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis in
original) (citations omitted).

Once the defendant has established a legitimate, non-
discriminatory reason for the adverse employment decision, the
burden shifts back to the plaintiff to show that the defendant's
reason is pretextual.  McDonnell Douglas, 411 U.S. at 804-05.
The relevant standard for showing pretext requires the plaintiff
to "demonstrate such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a
reasonable factfinder _could_ rationally find them 'unworthy of
credence,' and hence infer 'that the employer did not act for
[the asserted] non-discriminatory reasons.'"  Fuentes, 32 F.3d

at 765 (alteration in original) (emphasis in original) (first quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992); and then quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)). "It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Hicks, 509 U.S. at 519 (emphasis in original).

The plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been employer's real reason." Keller, 130 F.3d at 1109. Importantly in the context of this matter, it matters not to the Court "whether the employer is wise, shrewd, prudent, or competent" in its employment decisions. Fuentes, 32 F.3d at 765. Rather, all that matters is "whether discriminatory animus motivated the employer." Id.

The Third Circuit has synthesized the McDonnell Douglas burden-shifting framework and the summary judgment rule, holding that:

> to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes, 32 F.3d at 764.  With that standard in mind, the Court will examine Defendant's Motion for Summary Judgment on the discriminatory failure to hire claims.

### 3. Plaintiffs' Disparate Treatment Claims Under the ADEA

As outlined above, the first issue to resolve is whether, under a summary judgment standard, Plaintiffs have established a prima facie case of disparate treatment under the ADEA for failure to hire.  There is no dispute as to the first and third elements of the prima facie case: Plaintiffs were all in a protected class under the ADEA, as the first element requires, because they were all more than 40 years old at the relevant time.  Moreover, the parties agree that Plaintiffs were not hired for the job in question, as the third element requires.

That leaves the second and fourth elements.  As for the second element — that Plaintiffs applied for and were qualified for the job in question — there is no dispute as to whether Plaintiffs, given their many years of experience as law enforcement officers, were qualified for the jobs in question. Instead, Defendant argues that, because Plaintiffs submitted their applications after March 14, 2013, they did not "apply" to the jobs in question.  In support of this argument, Defendant points out that Defendant made all hiring decisions for former Camden City Police Departments on or before March 14, 2013.

Therefore, the argument goes, any applications received after that date, which include each of Plaintiffs' applications, were untimely.

Conversely, Plaintiffs argue that their applications were timely because the actual deadline was April 1, 2013, by which date each of Plaintiffs' applications was undisputedly submitted. Plaintiffs point to various documents that allude to a deadline of April 1, 2013, including a January 15, 2013 letter from the Camden County Board of Chosen Freeholders to the Members of the Fraternal Order of Police, Lodge 1. Furthermore, Plaintiff Babnew testified that he had conversations with the Civilian Police Director for Defendant and Lieutenant Saponare, both of whom Babnew alleges guaranteed that he would be hired despite his application being submitted on March 18, 2013.

Defendant's argument has some superficial appeal. It seems uncontroverted that someone made the decision to stop hiring Camden County officers from the Camden City officers "pool" of candidates on or before March 14th. Any officer who applied after that date, whatever their race or age, received the same treatment — a November rejection letter. Defendant's argument ignores, however, that many officers — albeit from the additional two pools — were in fact hired after March 14th. The open position applied for was the new position of a Camden County Police Officer, a fact the Defendant seemingly concedes,

not the artificial category of a Camden County Police Officer
who had previously served as a Camden City Police Officer.

In sum, considering the evidence in the light most
favorable to the nonmoving Plaintiffs, a reasonable jury could
find that Plaintiffs did, in fact, apply to the job in question,
regardless of when the "deadline" was.  Therefore, Plaintiffs'
satisfy the second element of the prima facie case.

The next issue, then, is the fourth element of the prima
facie case: "that the employer either ultimately filled the
position with someone sufficiently younger to permit an
inference of age discrimination, or continued to seek applicants
from among those having plaintiff's qualifications."  Fowle, 868
F.2d at 61 (citations omitted).  Plaintiffs argue that Defendant
both filled the position with younger applicants and continued
to seek applicants.

Defendant argues that it did not fill the positions with
younger applicants, but rather hired "many individuals the same
age and/or older than Plaintiffs."  (Mot. for Summ. J. [Docket
Item 58], at 5-6.)  Defendant argues that the only hires who
were "similarly situated" to Plaintiffs were other former Camden
City Police Officers, many of whom were the same age as or older
than Plaintiffs.

Plaintiffs argue that this information is incomplete or
even irrelevant because (1) all of those individuals were hired

before Plaintiffs applied, making it impossible for Plaintiffs to have applied to the same positions as those hires, and (2) other applicants who were not former Camden City Police Officers could be considered "similarly situated" to Plaintiffs. Of those applicants hired after March 14, 2013, it is undisputed that 291 (93%) of 312 were less than 40 years old.

Defendant argues that this statistic is not indicative of discrimination, but rather merely a product of the fact that Defendant had moved on to hiring from the third "pool" of candidates. Those candidates all inherently had to be under 40 years old because the age limit for entering the Police Academy is 35.

The statistical evidence proffered by Plaintiffs — which, to reiterate, shows that more than 93% of officers hired after March 14, 2013, were under the age of 40 — is adequate at this stage to show that Defendant "ultimately filled the position with someone sufficiently younger [than Plaintiffs] to permit an inference of age discrimination." Therefore, considering the evidence in the light most favorable to nonmoving Plaintiffs, a reasonable jury could find that the circumstances surrounding Defendant's failure to hire Plaintiffs raise an inference of discriminatory action.

Therefore, a reasonable jury could find that Plaintiffs have met all four requirements for a prima facie case here. The

next issue is Defendant's proffered legitimate, non-discriminatory reason and whether a reasonable factor would find that proffered reason pretextual.  Defendant's proffered legitimate, non-discriminatory reason for not hiring Plaintiffs is that they did not apply on time.  Defendant argues that its proffered reason is not pretextual because Defendant did not hire any of the 23 Camden City Police Officers who submitted applications after March 14, 2013.  Moreover, Defendant argues that Plaintiffs cannot point to any evidence suggesting discrimination on the basis of age.

Plaintiffs counter both of these arguments.  First, Plaintiffs argue that a reasonable factfinder could disbelieve Defendant's proffered reason based on evidence as to the alleged application deadline — if the jury believed that the deadline was actually April 1, then it could find Defendant's proffered reason to be pretextual.  Second, Plaintiffs point to circumstantial evidence, including the statistics and testimony mentioned above, in arguing that Defendant sought to get rid of older officers in creating the new police department.

The Court finds that Plaintiffs have not put forth sufficient evidence to show that Defendant's proffered legitimate, non-discriminatory reason is pretextual.  As noted above, it seems undisputed that, at some point, somebody within the Camden County Police Department decided that the cutoff for

hiring Camden City Police Officers was March 14, 2013. While this may have been a different date than what Plaintiffs had expected or even previously been told, that discrepancy does not make the deadline pretextual. After all, Plaintiffs' contention that Defendant was trying to hire younger applicants is undercut by the fact that 7 of the 23 officers who applied after March 14, 2013, and were thereafter rejected were younger than 40 years old.

Moreover, it is undisputed that Defendant simply did not consider those 23 applications at all, including the 7 from younger applicants. The undisputed evidence does show that Defendant simply decided to stop considering Camden City Police Officers on March 14, 2013. Whether the arbitrary and unannounced cut-off date was a wise, prudent, or even fair, decision by Defendant is irrelevant for a Title VII disparate treatment claim. What matters is that Plaintiffs have not shown that Defendant's proffered reason was motivated by discriminatory animus. In other words, Plaintiffs has not produced sufficient evidence to suggest that Defendant's reason for choosing the March 14 date was age discrimination.

In short, Plaintiffs cannot show that Defendant's proffered legitimate, non-discriminatory reason is pretextual. Therefore, even considering the evidence in the light most favorable to the

nonmoving Plaintiffs, summary judgment is appropriate as to
their disparate treatment claim under the ADEA.

### 4. Plaintiff McEady's Disparate Treatment Claim Under Title VII

The next claim the Court will address is Plaintiff McEady's
disparate treatment claim under Title VII for failure to hire
based on racial discrimination.  The first issue is whether
McEady has stated a prima facie case of racial discrimination.
As noted above, the first three elements of a prima facie case
under Title VII are the same as the first three elements of a
prima facie case under the ADEA.  As with the ADEA claim, the
parties agree that McEady satisfies the first element: he is
African American and is therefore a member of a class protected
by Title VII.  Defendant argues that McEady fails the second
element for the same reasons as the ADEA: he did not apply by
the deadline.  The same analysis set out above applies here: a
reasonable jury could find that McEady did in fact apply for the
position and, therefore, that the second element is of the prima
facie case is satisfied.  The third element is also satisfied
because McEady was not hired for the position for which he
applied.

That leaves only the fourth element of the prima facie
claim under Title VII: that under circumstances that raise an
inference of discriminatory action, Defendant continued to seek

applicants from similarly situated individuals after McEady's rejection.  Though a slightly different standard than the ADEA's fourth element, a similar analysis as above applies here.

Defendant argues that only former Camden City Police Officers qualify as "similarly situated" to McEady.  Defendant then points to statistics showing that 40 (26.3%) of the 152 former Camden City Police Officers hired by Defendant were African American, as were 12 (52.2%) of the 23 rejected applicants who applied after March 14, 2013.  McEady, like with Plaintiffs' ADEA claim, argues that those statistics are irrelevant because (1) all of those individuals were hired before Plaintiffs applied, making it impossible for McEady to have applied to the same positions as those hires, and (2) other applicants who were not former Camden City Police Officers could be considered "similarly situated" to McEady.  McEady then cites data showing that only 32 (10.2%) of the 312 officers hired after March 14, 2013, were African American.  Unlike in the ADEA claim, Defendant does not offer an explanation for this discrepancy.

The Court agrees with McEady: a reasonable jury could find that this data — showing that nearly 90% of officers hired after March 14, 2013, were not African American — raises an inference of discriminatory action.  As a result, McEady satisfies the fourth element of the prima facie case.  Because he has

satisfied all four elements, McEady has made out a prima facie case under Title VII and summary judgment is inappropriate on that basis.

The next issue, then, is whether Defendant has proffered a legitimate, non-discriminatory reason and, if so, could it be said to be pretext. The same basic analysis applies here as in the ADEA claim. Defendant's proffered legitimate, non-discriminatory reason for not hiring McEady is that he did not apply on time. Defendant points out that this is true for all 23 Camden City Police Officers who submitted applications after March 14, 2013. Defendant also argues that McEady can point to no evidence suggesting race-based discrimination. Therefore, Defendant argues, the proffered reason for not hiring McEady is not pretextual.

As with the ADEA claim, McEady argues that a reasonable factfinder could find that the deadline was actually April 1, which could lead to a finding of pretext. McEady also points to the statistics relied on above to argue that Defendant was trying to hire a predominantly white (or non-African American) force.

The Court finds that McEady has not put forth sufficient evidence to show that Defendant's proffered legitimate, non-discriminatory reason is pretextual. As the Court already explained, the discrepancy between the March 14 and April 1

deadlines does not amount to pretext.  Again, McEady's

contention that Defendant wanted a white force is undercut by

the fact that nearly half of the 23 officers whose "late"

applications were rejected were not African American —

including, of course, McEady's two white co-Plaintiffs.  As

noted above, the undisputed evidence does show that Defendant

simply decided to stop considering Camden City Police Officers

on March 14, 2013.  Again, the wisdom, prudence and procedural

fairness of that decision is not relevant to the Court's

decision.  What matters is that McEady has not produced

sufficient evidence for a factfinder to conclude Defendant's

reason for the arbitrary cutoff date was really race

discrimination.  As with the ADEA claim, McEady has not shown

that Defendant's "proffered reason was . . . so plainly wrong

that it cannot have been [its] real reason."  See Keller, 130

F.3d at 1109.

In other words, McEady cannot show that Defendant's

proffered legitimate, non-discriminatory reason for not hiring

him is pretextual.  Therefore, even considering the evidence in

the light most favorable to McEady, summary judgment is

appropriate as to his disparate treatment claim under Title VII.

**B. Disparate Impact Under the ADEA and Title VII**

Discrimination claims may also proceed under a disparate-

impact theory, See Karlo v. Pittsburgh Glass Works, LLC, 849

34

F.3d 61, 69 (3d Cir. 2017) (ADEA); NAACP v. N. Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011) (Title VII), which requires proof of elements that are in some more onerous than disparate treatment claims and in some ways less so.

"To state a prima facie case for disparate impact under the ADEA, a plaintiff must (1) identify a specific, facially neutral policy, and (2) proffer statistical evidence that the policy caused a significant age-based disparity." Karlo, 849 F.3d at 69 (citing N. Hudson Reg'l Fire & Rescue, 665 F.3d at 476-77). Under Title VII, a plaintiff must "demonstrat[e] that application of a facially neutral standing has caused a 'significantly discriminatory hiring pattern.'" N. Hudson Reg'l Fire & Rescue, 665 F.3d at 476 (quoting Newark Branch, NAACP v. City of Bayonne, N.J., 134 F.3d 112, 121 (3d Cir. 1998)). This "requires the plaintiff to prove a significant statistical disparity and to 'demonstrate that the disparity [he] complain[s] of is the result of one or more of the employment practices that [he is] attacking.'" Id. (quoting Bayonne, 134 F.3d at 121). Although these standards do not require a plaintiff to prove discriminatory motive or intent, they do require a showing of actual discrimination. Bryan v. Int'l Sch. Servs., Inc., 675 F.2d 562, 572 (3d Cir. 1982).

In satisfying the first prong of the prima facie case, "it is not enough to simply allege that there is a disparate impact

on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the <u>specific</u> employment practices that are allegedly responsible for any observed statistical disparities." <u>Smith v. City of Jackson</u>, 544 U.S. 228, 241 (2005) (emphasis in original) (internal quotation marks omitted) (quoting <u>Wards Cove Packing Co. v. Antonio</u>, 490 U.S. 642, 657 (1989)).

Once the plaintiff has satisfied the first prong, they must prove causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." <u>Watson v. Ft. Worth Bank & Trust</u>, 487 U.S. 977, 994 (1988). Such statistical evidence should compare "the racial [or age] composition of [the at-issue jobs] and the racial [or age] composition of the qualified . . . population in the relevant labor market." <u>N. Hudson Reg'l Fire & Rescue</u>, 665 F.3d at 477 (second alteration in original) (omission in original) (quoting <u>Bayonne</u>, 134 F.3d at 121). This requires an analysis of the relevant work force as a whole, as opposed to simply the parties involved in the lawsuit. <u>See</u> <u>id.</u> at 479 (comparing the racial makeup of Defendant's employees with that of the town as a whole); <u>Bayonne</u>, 134 F.3d at 115 (same); <u>Newark Branch, NAACP v. Town of Harrison, N.J.</u>, 940 F.2d 792, 796 (3d Cir. 1991) (same).

Here, Plaintiffs fail to make out the prima facie case.
Plaintiffs claim to have identified two employment practices
that warrant a disparate impact claim.  The first is Defendant's
refusal to consider any applications submitted by former Camden
City Police Officers after March 14, 2013.  The second is
Defendant's alleged policy to only hire unqualified rookies on
or after March 20, 2013, despite having applications from older,
qualified applicants.

However, Plaintiffs have not offered statistical evidence
that is both reliable and substantial enough to raise an
inference of causation.  See N. Hudson Reg'l Fire & Rescue, 665
F.3d at 477.  The only statistics offered by Plaintiffs concern
the age and racial demographics of the individuals who were
actually hired by Defendant.  Plaintiffs offer no evidence
whatsoever about the "population in the relevant labor market."
Lacking such evidence, Plaintiffs' ADEA and Title VII disparate
impact claims fail for not making out a prima facie case.
Therefore, summary judgment is appropriate as to those claims.

### C. Retaliation Under the ADEA and Title VII

All three Plaintiffs next allege claims of retaliation
under the ADEA and Title VII.  Retaliation claims under the ADEA
and Title VII are analyzed using the McDonnell Douglas burden-
shifting framework outlined above.  See Fasold v. Justice, 409
F.3d 178, 188 (3d Cir. 2005) (ADEA); Farrell v. Planters

_Lifesavers Co._, 206 F.3d 271, 278-79 (3d Cir. 2000) (Title VII).
To establish a prima facie claim, a plaintiff must show that:
(1) the plaintiff engaged in a protected employee activity; (2)
the plaintiff suffered an adverse employment action either
subsequent to or contemporaneous with the protected activity;
and (3) there is a causal connection between the protected
activity and the adverse action. _Fasold_, 409 F.3d at 188.
"Protected activities include not only an employee's filing of
formal charges of discrimination against an employer but also
'informal protests of discriminatory employment practices,
including making complaints to management.'" _Smith v. N3
Oceanic, Inc._, 717 F. App'x 162, 165-66 (3d Cir. 2017) (quoting
_Daniels v. Sch. Dist. of Phila._, 776 F.3d 181, 193 (3d Cir.
2015)). Such complaints "must allege that the opposition was to
discrimination based on a protected category, such as age or
race." _Daniels_, 776 F.3d at 193.

As for the causation requirement, the Third Circuit "has
focused on two main factors in finding the causal link necessary
for retaliation: timing and evidence of ongoing antagonism.
_McGlone v. Phila. Gas Works_, 733 F. App'x 606, 612 (3d Cir.
2018) (quoting _Abramson v. Wm. Patterson College of N.J._, 260
F.3d 265, 288 (3d Cir. 2001)). "An employee may establish a
causal nexus if he shows 'unusually suggestive' temporal
proximity between" the protected activity and the adverse

38

action.  Holt v. Pennsylvania, 683 F. App'x 151, 157 (3d Cir.
2017) (citing Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503
F.3d 217, 232 (3d Cir. 2007)).  If too much time has passed to
allow the finding of a causal link between the protected
activity and the adverse action, "courts may [also] look to the
intervening period for other evidence of retaliatory animus."
Id. (quoting Farrell, 206 F.3d at 281).  Such evidence can
include "a pattern of ongoing antagonism, inconsistencies in the
employer's justifications, or any other 'evidence gleaned from
the record as a whole' that is sufficient to support an
inference of retaliatory animus."  Id. (quoting Farrell, 206 F.
3d at 281).

     If a plaintiff states a prima facie case, then the burden
shifts to the defendant to proffer a legitimate, non-retaliatory
reason for the adverse employment action.  Daniels, 776 F.3d at
193.  Finally, if the defendant does that, then the burden
shifts back to the plaintiff to show that the proffered reason
is false, and that the real reason for the action was
retaliation.  Id.

### 1. Plaintiffs Fritz and McEady

     Plaintiffs Fritz and McEady claim that written complaints
submitted by their union, the NAACP, and their attorneys
constituted protected activity for them.  They cite to two cases
from the Eastern District of Pennsylvania to support their

assertion.  Those cases are factually distinguishable from the case at hand.  Plaintiffs first cite <u>Mitchell v. Community Education Centers, Inc.</u>, in which the plaintiff's union had protested plaintiff's termination specifically.  C.A. No. 14-5026, 2015 WL 4770652 (E.D. Pa. Aug. 11, 2015).  Similarly, Plaintiffs cite <u>Simmons v. Community Education Centers, Inc.</u>, a case in which the plaintiff herself made various complaints and requests to her employer about work conditions before she was fired.  C.A. No. 15-929, 2015 WL 1788712, at *1-3 (E.D. Pa. April 20, 2015).  In this case, Plaintiffs do not refer to any complaints written specifically on their behalf like the plaintiff in <u>Mitchell</u>, but rather complaints written by various parties opposing the hiring process in general.  Nor did Plaintiffs themselves make any complaints or requests to their employers like the plaintiff in <u>Simmons</u>.  Therefore, whether under the ADEA or Title VII, Plaintiffs Fritz and McEady have not stated a prima facie retaliation claim because they did not engage in any protected activity.

### 2. Plaintiff Babnew

Plaintiff Babnew asserts two additional bases for his retaliation claim: his vocal opposition of Defendant at union meetings and an email that he submitted to the County via the union.  A decisionmaker must be aware of a plaintiff's engagement in protected activity for a retaliation claim to be

cognizable.  See Moore v. City of Phila., 461 F.3d 331, 351 (3d
Cir. 2006) ("It is not reasonable for a factfinder to infer that
an employer's reaction was motivated by an intent to retaliate
for conduct of which the employer's decision maker was not
aware.").  Babnew offers no evidence that any of Defendant's
"decisionmakers" were aware of his statements made at union
meetings, and even with all reasonable inferences being made in
the light most favorable to Babnew, there is insufficient
evidence for a factfinder to come to such a conclusion.
Therefore, those statements do not provide an adequate basis for
the retaliation claim because they do not satisfy the third
element of the prima facie case: causation.

Nor does Babnew's other basis for this claim — the email
that he sent to his union representative — satisfy the prima
facie case for retaliation under the ADEA.  Babnew does satisfy
the second prong because it is undisputed that he suffered an
adverse employment decision after sending the email, since he
was not hired by Defendant the following year.  However, Babnew
has produced insufficient evidence for a reasonable jury to
conclude both that he engaged in protected activity and that,
assuming the email was protected activity, there was a causal
connection between it and Defendant's decision not to hire him.

Babnew alleges that he wrote the email to his union
representative with instructions for the representative to

forward the email to the County.  The only evidence Babnew has

offered to show that he engaged in protected activity is purely

speculative.  He merely testified that he "would imagine" that

Chief Thomson was aware of the email.  Also, Babnew readily

admits that he has no evidence to show that Chief Thomson,

assuming that he had seen the email, even knew who had written

it.  This speculation on Babnew's part is far from sufficient

evidence for a reasonable jury to conclude that Babnew made

"informal protests of discriminatory employment practices" via

his email.  See N3 Oceanic, Inc., 717 F. App'x at 165-66

(quoting Daniels, 776 F.3d at 193).  Therefore, the Court finds

that Babnew has not satisfied the first prong of the prima facie

case: engagement in protected activity.

Even if Babnew had engaged in protected activity, he has

not presented sufficient evidence to establish causation, as the

third element of the prima facie case requires.  Babnew sent

this email 11 months before he even submitted his application to

Defendant, a timeline that is not so "unusually suggestive" to

permit an inference of retaliatory motive.  See Krouse v.

American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)

(finding the same for a 19-month period).  Nor does Babnew offer

any other evidence to suggest a retaliatory animus.  To

reiterate, the best Babnew does in that regard is his mere

speculation that he "would imagine" that Chief Thomson read the

email, and his admission that he does not know if Chief Thomson would have even known who wrote the email.[4] Therefore, even considering the evidence in the light most favorable to Babnew, his email does not provide an adequate basis for the retaliation claim because it does not satisfy the causation element of the prima facie case.

In sum, Babnew has not stated a prima facie retaliation claim because he does not present evidence sufficient to show (1) that he engaged in protected activity or (2) a causal connection between his protected activities and Defendant's decision not to hire him. Therefore, the Court will grant summary judgment in favor of Defendant's as to Babnew's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment as to all of Plaintiffs' claims. The accompanying Order shall be entered.

October 7, 2019_____          s/Noel L. Hillman_____
Date                          NOEL L. HILLMAN
                              U.S. District Judge

---

[4] And even if Chief Thomson read the email and knew that Babnew wrote it, Babnew has not presented sufficient evidence to show that Chief Thomson was a "decisionmaker." This provides yet another basis for finding that Babnew did not engage in protected activity: just like with his argument about his vocal opposition at union meetings, Babnew has not shown that any decisionmaker was aware of the complaints he lodged in the email in question.